**ROYAL INDEMNITY COMPANY a/s/o Dana Corporation, Plaintiff,**

v.

**SECURITY GUARDS, INC., Defendant.**

**Civil Action No. 01–4013.**

United States District Court, E.D. Pennsylvania.

April 4, 2003.

Kevin J. O'Brien, Marks, O'Neill, Reilly and O'Brien, Timothy D. Rau, Marks, O'Neill, O'Brien & Courtney, P.C. Philadelphia, PA, Jeffrey Crawford, Phillip Silverberg, Kevin Buckley, Mound, Cotton, Wollan & Greengrass, Leonard Sheft, Mound Cotton Wollan & Greengrass, New York City, for Plaintiff.

David R. Strawbridge, Cozen & O'Connor Philadelphia, PA, David A. Parker, Parker, McCay & Criscuolo, P.A., P.C., Dean J. Buono, Parker McCay & Criscuolo, Marlton, NJ, Thomas M. Regan, Cozen O'Connor, Philadelphia, PA, for Defendant.

## MEMORANDUM

BAYLSON, District Judge.

This subrogation action requires the Court to construe a limitation of liability clause. In doing so, the Court must address any differences between negligence and gross negligence under Pennsylvania law. The underlying facts concern a fire that occurred at an industrial facility operated by Dana Corporation, a truck frame manufacturer. Dana's insurer, plaintiff Royal Indemnity Company, paid Dana more than $16.5 million as a result of the fire, and now, as subrogee of Dana, seeks damages of at least $7 million from defendant Security Guards, Inc., which provided guard services for Dana. Royal Indemnity alleges that SGI failed to properly respond to an alarm, which resulted in the spread of the fire.

Oral argument was held on March 7, 2003. For the reasons that follow, Defendant's Motion for Summary Judgment that the damages cannot exceed $50,000, and thus there is no federal jurisdiction, will be denied.

## I. *Background*

The following facts are viewed in the light most favorable to the plaintiff.

This subrogation action arises out of a fire that occurred on August 11, 1999 at a truck frame manufacturing facility located in Reading, Pennsylvania. (Pl.'s Compl. ¶¶ 8, 18). The facility was owned and operated by Dana Corporation ("Dana"), a Virginia corporation with its principal place of business in Toledo, Ohio. *Id.* ¶¶ 2, 8. At all relevant times, Royal Indemnity Company ("Royal"), a Delaware corporation with its principal place of business in Charlotte, North Carolina, was Dana's property insurer. *Id.* ¶ 6.

At the time of the fire, defendant Security Guards, Inc. ("SGI"), a Pennsylvania corporation with its principal place of business in Wyomissing, Pennsylvania, provided guard services to Dana at its Reading facility pursuant to a security services agreement ("Agreement") between Dana and SGI executed on August 14, 1989, and renewed annually pursuant to its terms. *Id.* ¶¶ 3, 9; Pichini Aff., Def.'s Mot. Summ. J., Ex. 1. At the time of the fire, the agreement was in full force and effect, subject only to the fact that the hourly rate for each guard had increased from $9 to $12.58. *Id.* ¶ 10; Pichini Aff. ¶ 9, Def.'s Mot. Summ. J., Ex. 1.

SGI employee Hank Clarke ("Clarke") was stationed at Dana's main security guard booth on August 11, 1999, from 2 p.m. to 10 p.m. (Pl.'s Compl. ¶ 12). Upon the sounding of a "critical alarm," or Point 51 alarm, SGI guards were required to immediately contact the maintenance su-

pervisor located in the area where the alarm sounded and to contact ADT, the alarm company, which, in the case of a fire, would contact the Reading fire department. *Id.* ¶ 13. At 5:39 p.m., a critical alarm was activated by a fire in the paint shop in Section 104 of the Lewis building at the Dana plant. *Id.* ¶¶ 16, 17. Royal alleges that Clarke failed to immediately contact the supervisor in the area of the alarm or upon the sounding of three subsequent critical alarms and attempted to instead reset the alarm. *Id.* ¶¶ 19–21. At 5:54 p.m., approximately fifteen minutes later, ADT automatically received a signal that Dana's fire alarm had been activated and notified the Reading fire department. *Id.* ¶ 23. Royal claims the fire department would have responded to the fire fifteen minutes earlier if Clarke had followed the appropriate security procedure and that the amount of damage to the plant would have been substantially less. *Id.* ¶¶ 24, 25.

As a result of the fire, Dana made a claim on Royal, and in accordance with its policy terms, Royal paid Dana $16,535,882.84. *Id.* ¶ 27; Subrogation Receipt, Def.'s Mot. Summ. J., Ex. A.

Royal, as Dana's subrogee, initiated this action. The three-count Complaint alleges negligence (Count I), gross negligence (Count II), and breach of contract (Count III) against SGI for its employees' failure to promptly respond to the critical alarm signal at the Dana plant by immediately contacting the maintenance supervisor and the alarm company, who would have alerted the Reading fire department. *Id.* ¶ 28–36. Royal alleges that as a result of SGI's alleged failure to respond to the critical alarm that the fire department could not respond to the fire at the Dana plant until approximately fifteen minutes after the first critical alarm sounded, resulting in greater damage to the plant. *Id.* ¶¶ 29, 32, 35. On each count, Royal claims damages of at least $7 million plus interest and costs of suit. *Id.* ¶¶ 30, 33, 36.

## II. *Legal Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the Court

must view the evidence presented on the motion in the light most favorable to the opposing party. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

 This diversity action is governed by substantive state law. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78–80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). When ascertaining Pennsylvania law, the decisions of the Pennsylvania Supreme Court are the authoritative source. *See State Farm Mut. Automobile Ins. Co. v. Coviello,* 233 F.3d 710, 713 (3d Cir.2000) (citing *Connecticut Mut. Life Ins. Co. v. Wyman,* 718 F.2d 63, 65 (3d Cir.1983)). If the Pennsylvania Supreme Court has not yet passed on an issue, then this court will consider the pronouncements of the lower state courts. *See id.*

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff and Defendant are citizens of different states, and the amount in controversy exceeds $75,000. (Pl.'s Compl. ¶ 4). Venue is appropriate under 28 U.S.C. § 1391(a) because the events giving rise to the claim occurred in this District, and the property that is the subject of this action is located in this District. *Id.* ¶ 5.

## III. *Discussion*

### A. *Limitation of Liability Clause*

The limitation of liability clause in the contract between Dana and SGI states in relevant part:

> In the event of any bodily injury or property damage loss sustained by CLIENT [Dana] and caused solely by the negligence of CONTRACTOR [SGI] or its employees, CONTRACTOR [SGI] will indemnify and hold CLIENT [Dana] harmless for such loss to the extent of $50,000 per occurrence.

(Agreement, Def.'s Mot. Summ. J., Ex. 1). By its terms, this clause is limited to claims based on negligence.

 Under Pennsylvania law, "[i]t is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney,* 498 Pa. 45, 444 A.2d 659, 661 (1982). "In deciding whether contract language is unambiguous, a court not only asks whether the language is clear, but also hears the proffer of the parties and determines if there are 'objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings.'" *John Wyeth & Bro. Ltd., v. CIGNA Int'l. Corp.,* 119 F.3d 1070, 1074 (3d Cir.1997). To be ambiguous, a contract provision must be capable of two reasonable, alternative meanings. *Madison Constr. Co. v. Harleysville Mut. Ins. Co.,* 557 Pa. 595, 735 A.2d 100, 106 (1999). To be unambiguous, a contract provision must be reasonably capable of only one construction. *Wyeth,* 119 F.3d at 1074. It is the court's function to determine if a provision is ambiguous. *Polish American Machinery Corp. v. RD & D Corp.,* 760 F.2d 507, 512 (3d Cir.1985). In doing so, the court must not "distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity." *Madison Constr.,* 735 A.2d at 106.

Defendant SGI moves for summary judgment and contends that pursuant to the terms of the agreement between Dana and SGI in effect at the time of the fire, that Royal's damages are limited to $50,000, which cannot satisfy the $75,000 amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332(a), and therefore Royal's claim must be dismissed. (Def.'s Mot. Summ. J. at 1–2).

SGI asserts that this provision was essential to the agreement. (Pichini Aff. ¶ 6, Def.'s Mot. Summ. J., Ex. 1). SGI maintains that this provision clearly and unambiguously limits its liability for any damages caused to Dana by SGI's negligence to $50,000. (Def.'s Mem. Law. Supp. Mot. Summ. J. at 5).

SGI notes that whereas exculpatory clauses are generally disfavored by courts and subject to strict construction standards, limitation of liability clauses are not disfavored and are construed under the general rules applying to contract interpretation. *See Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195, 202–03 (3d Cir.1995); Def.'s Mem. Law. Supp. Mot. Summ. J. at 6. SGI seeks to enforce the $50,000 limitation of liability clause against Dana because it claims that the parties were aware of the potential multimillion-dollar exposure to SGI, and that the $50,000 amount is reasonable when considered against SGI's fees for providing security services, which amounted to $533,733.19 for 1999. Def.'s Mem. Law. Supp. Mot. Summ. J. at 7 (citing Pichini Aff. ¶ 9, Def.'s Mot. Summ. J., Ex. 1).

Plaintiff opposes summary judgment and contends that the limitation of liability clause is strictly limited to negligence, that the issues in this case raise the standard of gross negligence which is well-founded under Pennsylvania law, and also the limitation of liability clause does not address the claims based on breach of contract.

This Court previously has examined the scope of limitation of liability clauses in contracts in situations similar to the instant case. In *Neuchatel Insurance v. ADT Security Systems, Inc.*, No. CIV. A.96–5396, 1998 WL 966080, at *1 (E.D.Pa. Nov. 5, 1998) (Pollak, S.J.), the plaintiff insurer brought a subrogation action against defendants ADT and others alleging that their negligence and gross negligence resulted in the burglary of a Rolex watch repair facility and the theft of $1.8 million in merchandise. After examining the plaintiff's evidence and limitation of liability clause in the contract between the plaintiff and defendants, the Court concluded that the contract limited the defendants' liability for acts of negligence and gross negligence and granted summary judgment in favor of the defendants. *Id.* at *13.

In *Neuchatel,* the limitation of liability provision in question was substantially broader than the provision in the instant case. The first provision provided:

> It is understood that ADT is not an insurer ... and that the amounts payable to ADT hereunder are based upon the value of the services and the scope of liability as herein set forth and are unrelated to the value of the customer's property or property of others located in customer's premises. ADT makes no guaranty or warranty, including any implied warranty of merchantability or fitness, that the system or services supplied, will avert or prevent occurrences or the consequences therefrom, which the system or service is designed to detect. It is impractical and extremely difficult to fix the actual damages, if any, which may proximately result from the failure on the part of ADT to perform any of its obligations hereunder. The customer does not desire this contract to provide for full liability of ADT and agrees that ADT shall be exempt from liability for loss, damage or injury due directly or indirectly to occurrences or consequences therefrom, which the service or system is designed to detect or avert; that if ADT should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% of the annual service charge or $10,000, whichever is less, as the agreed upon damages and not as a

penalty, as the exclusive remedy; *and that the provisions of this paragraph shall apply if loss, damage or injury irrespective of cause or origin results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract* or from negligence, active or otherwise, of ADT, its agents or employees.

*Id.* at \*8 (emphasis added).

Similarly, the provision in the insured's contract with defendant Wells Fargo contained language limiting that defendant's liability:

It is agreed that Wells Fargo is not an insurer and that the payments herein provided are based upon the cost to Wells Fargo of its services hereunder, and the extent of its liability as herein below limited; that in the event of a default on the part of Wells Fargo *in the performance of any of its obligations hereunder, either by way of non-performance or negligent performance or otherwise,* and as a resulting loss, or in any event resulting from the relationship hereby created, Wells Fargo's liability shall not exceed the sum of $50.00 and Subscriber's sole remedy at law or in equity shall be the right to recover a sum within such limit.

*Id.* at \*9 (emphasis added).

The Court concluded that:

The ADT and Wells Fargo contracts both contain clauses excluding, and/or placing a dollar ceiling on, liability; and in both instances those clauses are keyed to negligence and conduct that is "otherwise" wrongful. Accordingly, this court concludes that, notwithstanding plaintiffs' allegations of gross negligence, plaintiffs' potential recovery is limited by those clauses.

*Id.* at \*10.

▆▆▆▆ In the instant case, the limitation of liability provision only limits liabil-

ity for damages "caused solely by the negligence" of SGI or its employees. (Agreement, Def.'s Mot. Summ. J., Ex. 1). The Court agrees with Judge Pollak's finding in *Neuchatel* "that if either an exculpatory clause or a limitation of liability clause excludes or limits only negligent conduct and is not broad enough to cover conduct that may be described as grossly negligent, willful or wanton, liability is neither excluded nor limited if the conduct alleged is found to be grossly negligent, willful, or wanton." *Id.* at \*7 n. 4. Additionally, the limitation of liability provision makes no reference to liability for performance or non-performance under the contract, so liability is neither excluded nor limited for breach of contract.

## B. *Claims Based on Negligence*

Royal claims that SGI's duty to Dana is undisputed. If a Point 51 critical alarm was triggered in the Dana paint shop, it was Dana's procedure for the SGI guard to immediately notify the Department 104 supervisor. (Pichini Aff. ¶ 14, Def.'s Mot. Summ. J., Ex. 1; Clarke Dep. at 20–21, 34, 63–64, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. B; Ott. Dep. at 101, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. C). A Point 51 critical alarm was triggered on August 11, 1999 at 5:39 p.m., approximately fifteen minutes before a fire alarm was triggered, and Clarke was monitoring the alarm panel for Dana in the control booth. (Pichini Aff. ¶¶ 10–12, Def.'s Mot. Summ. J., Ex. 1). Clarke knew that he was always required to call someone in response to a Point 51 critical alarm, and he was usually able to contact a Dana supervisor within a minute. (Clarke Dep. at 67–69, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. B). Royal alleges that Clarke neglected his duty. (Pl.'s Mem. Law. Resp. Def.'s Mot. Summ. J. at 8).

Mr. Janisjewski, the Reading fire marshal, testified that the sooner a fire department responds to a fire, the less damage is

done, and with regard to Dana's paint shop fire, he stated that there was an incipient stage to the fire, for approximately ten to fifteen minutes before it broke into full flame, but by the time the Reading fire department was alerted, the paint shop was engulfed in flames. (Janisjewski Dep. at 46–48, 199–202, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. E).

Royal's fire cause and origin expert, John F. Goetz, testified that it was likely that the fire started small before burning across the side and under the dip tank, and that it was likely that the fire burned for two to five minutes before triggering the Point 51 alarm. (Goetz Aff. ¶¶ 5, 7, Goetz Dep. of Oct. 22, 2002 at 223–24, Ex. 1). Mr. Goetz stated that the "delay in alerting the fire department resulted in significant additional fire damage to the Dana paint shop well in excess of one million dollars." (Goetz Aff. ¶ 10).

Royal further supports its claim that the fifteen-minute delay resulted in the spread of the fire by pointing to the arrival of the deputy fire chief on the scene three minutes after the fire department was alerted. (Moyer Dep. at 75–76, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. D). Royal also asserts that even if the alarm were placed in test mode, as SGI contends, SGI guards were not instructed to ignore all alarms, or specifically the Point 51 critical alarms, but would not respond if an alarm was in test mode only if specifically ordered not to do so. (Clarke Dep. at 56; Ott. Dep. at 103, Pl.'s Resp. Def.'s Mot. Summ. J., Exs. B, C). Mr. Clarke does not recall placing the alarm in test mode or being told by anyone to ignore the Point 51 critical alarm on the day of the fire (Clarke Dep. at 53, 57, Pl.'s Resp. Def.'s Mot. Summ. J., Ex. C). Although Clarke did not know what a "critical alarm" referred to, he knew that it could be "very, very serious" and that it was always his duty to call a supervisor when such an alarm sounded. *Id.* at 25–26, 61, 67.

Royal, through affidavits [1] and depositions, has pointed to genuine issues of material fact as to whether Clarke's failure to contact Dana personnel when the Point 51 critical alarm sounded constitutes negligence. SGI's Motion for Summary Judgment on Count I will be denied. However, if a jury were to conclude that SGI was negligent, its liability would be limited to $50,000 as provided in the limitation of liability clause in the contract between Dana and SGI.[2]

1. Royal contends that the affidavit of Guido M. Pichini, president and CEO of SGI, is inadmissible because he does not have personal knowledge of the facts as required by Fed.R.Civ.P. 56(e). (Pl.'s Mem. Resp. Def.'s Mot. Summ. J. at 23). Royal also asserts that the exhibits to his affidavit should not be considered. *Id.* However, Royal repeatedly cites to Pichini's affidavit as factual support for its assertions in its brief responding to Defendant's Motion for Summary Judgment. *See* Pl.'s Resp. Def.'s Mot. Summ. J. at 2, 8, 18.

SGI responds that it can meet its initial burden by relying entirely on the agreement between Dana and SGI and that Pichini's affidavit merely authenticates that agreement. (Def.'s Reply Brief Supp. Mot. Summ. J. at 9–10; Pichini Aff. ¶¶ 6–8, Def.'s Mot. Summ. J., Ex. 1). SGI argues that Mr. Pichini, as SGI's president and CEO and an SGI employee since 1983, is familiar with the services his company provides to clients such as Dana as well as being familiar with the manner in which SGI performs its security duties and that his affidavit and attached exhibits are proper. (Def.'s Reply Brief Supp. Mot. Summ. J. at 10).

Royal's argument is not well-supported by the record, and Royal's own reliance on the affidavit in its responsive brief belies its own argument. The Court finds that Mr. Pichini's affidavit is admissible.

2. SGI is correct that if negligence were the only claim, federal jurisdiction would not exist. However, because the Court concludes below that other claims, where the amount in controversy exceeds $75,000, exists, federal jurisdiction is established.

### C. Claims Based on Gross Negligence

SGI contends that Count II of Royal's Complaint, alleging gross negligence, must fail because the limitation of liability clause applies to negligence claims, and SGI cites numerous cases to support its argument that Pennsylvania does not recognize a cause of action for gross negligence. (Def.'s Mem. Law. Supp. Mot. Summ. J. at 7).

There are many decisions of the Pennsylvania and federal courts applying Pennsylvania law and which discuss the concept of gross negligence. Analyzing the holdings and the language of the numerous Pennsylvania cases on this issue is more similar to looking at multiple pellets from a shotgun as compared to a single bullet from a rifle.

SGI points to *Ferrick Excavating and Grading Company v. Senger Trucking Company*, 506 Pa. 181, 484 A.2d 744, 749 (1984), in which the Pennsylvania Supreme Court wrote that "there are no degrees of negligence in Pennsylvania." SGI also points to the Third Circuit's discussion of gross negligence in *Fialkowski v. Greenwich Home for Children, Inc.*, 921 F.2d 459, 462 (3d Cir.1990), in which the Court observed that "[d]egrees of negligence are not generally recognized under Pennsylvania common law." Following *Fialkowski*, in *Jordan v. City of Philadelphia*, 66 F.Supp.2d 638, 644–45 (E.D.Pa.1999), the District Court dismissed a gross negligence count of a complaint in response to a Rule 12(b)(6) motion, finding that the plaintiffs could proceed with their claims under a general negligence theory with gross negligence as the alleged standard of care violated. However, it is not necessary to attempt to harmonize these many cases or to try to devise a uniform theory under Pennsylvania law in order to decide the summary judgment issue in this case.

In *Shouey v. Duck Head Apparel Company, Inc.*, 49 F.Supp.2d 413, 417 (W.D.Pa.

1999), the court addressed the concept of gross negligence having relevance under Pennsylvania law only as it pertains to different standards of care, which are not generally applicable in negligence cases. The court disregarded the claim of gross negligence and considered the complaint as simply having asserted a claim for negligence. *Id.* at 418.

SGI asserts that because the instant case does not involve any of the unique circumstances requiring a consideration of a different standard of care than that presented in an ordinary negligence case, that Royal's gross negligence claim is not cognizable under Pennsylvania law. (Def.'s Mem. Law. Supp. Mot. Summ. J. at 9).

SGI also contends in the alternative that Royal's factual allegations do not meet Pennsylvania's standard for gross negligence. Pennsylvania courts generally view gross negligence as "a want of even scant care, but something less than intentional indifference to consequences of actions." *Fidelity Leasing Corp. v. Dun & Bradstreet, Inc.*, 494 F.Supp. 786, 790 (E.D.Pa.1980). Gross negligence also has been defined as a "failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness of wantonness." *Williams v. State Civil Serv. Comm'n*, 9 Pa.Cmwlth. 437, 306 A.2d 419, 422 (1973), *aff'd*, 457 Pa. 470, 327 A.2d 70 (1974). To find gross negligence, there must be "an extreme departure from ordinary care." *Douglas W. Randall, Inc. v. AFA Protective Systems, Inc.*, 516 F.Supp. 1122, 1126 (E.D.Pa.1981), *aff'd*, 688 F.2d 820 (3d Cir. 1982). SGI contends these cases demonstrate a focus on the defendant's conduct rather than on the results of the incident.

Royal contends that whether gross negligence is considered a standard of care violated under a negligence theory, or

whether it is a separate cause of action, is a distinction with no practical relevance because Pennsylvania consistently has recognized that limitation of liability clauses which merely mention "negligence," such as the one in the instant case, do not limit damages arising out of gross negligence. (Pl.'s Mem. Law. Resp. Def.'s Mot. Summ. J. at 5). This Court concludes Royal's argument is supported by close analysis of case law.

The Court agrees with Royal that the Third Circuit's discussion in *Fialkowski* that "degrees of negligence are not generally recognized under Pennsylvania common law" is dicta because other language in the case identifies Pennsylvania "cases holding that the allegations of the complaint were sufficient to state a claim for gross negligence." 921 F.2d at 462 n. 6.

Royal deems inapposite the language in *Ferrick* that "there are no degrees of negligence in Pennsylvania" because that case concerned the standard of care applicable to bailment situations and did not specifically discuss gross negligence. 484 A.2d at 749. As noted, though, in *Home Indemnity Company v. National Guardian Sec. Services Corp.*, No. CIV.A.94–4964, 1995 WL 298233, at *4 (E.D.Pa. May 11, 1995), there are numerous post-*Ferrick* opinions recognizing gross negligence as a theory or standard under Pennsylvania law. For example, in *Nicholson v. Mount Airy Lodge, Inc.*, No. CIV.A.96–5381, 1997 WL 811935, at *4 (E.D.Pa. Dec. 29, 1997), the Court denied the defendant's motion for summary judgment on the plaintiff's claim of gross negligence and noted the following:

> Generally, "the issue of whether a given set of facts satisfies the definition of gross negligence is a question of fact to be determined by a jury." *Albright v. Abington Mem'l Hosp.*, 548 Pa. 268, 696 A.2d 1159, 1164–65 (1997) (discussing "gross negligence" under 50 P.S.

§ 7114(a)); *Stark Co. v. National Guardian Sec. Servs.*, 1990 WL 112110, *3 [ (E.D.Pa. Aug. 3, 1990) (Shapiro, J.) ] (generally whether "defendant's actions demonstrate the lack of care required of gross negligence is a question of fact for the jury"). The court may decide the issue as a matter of law only when "the conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence." *Albright*, 696 A.2d at 1165.

In *Douglas W. Randall*, a store security system triggered numerous false alarms, which the security company responded to by adjusting the system so that the alarms stopped. The court denied the defendant's motion for judgment notwithstanding the verdict, finding that if the defendant turned down the sensitivity level of the system to such a low level that it could not detect the entry of a person into the store, that the jury did not err in finding that the defendant's actions departed from the standard of ordinary care to the extent that they constituted gross negligence. 516 F.Supp. at 1126.

In *Newark Ins. Co. v. ADT Security Systems, Inc.*, No. CIV.A.96–3469, 1997 WL 539752, at *1 (E.D.Pa. Aug. 5, 1997), the plaintiff insurance company, as subrogee of its insured, brought an action against the defendants ADT and Bell Atlantic alleging negligence, gross negligence, and breach of contract, among other claims, stemming from a burglary of videotapes from the insured's warehouse. Defendant ADT had installed and maintained the alarm at the warehouse, and the defendant Bell Atlantic had provided service on the telephone lines. *Id.* The Court found that a genuine issue of material fact existed as to whether ADT was negligent or grossly negligent in allowing the warehouse alarm system to allegedly remain

unmonitored for 56 days and in not performing certain tests required for particular alarm systems. *Id.* at *5. The Court denied ADT's motion for summary judgment, finding that if ADT were found negligent at trial, its liability would be limited to $1,000 as provided in the limitation of liability clause in its contract with the insured, but if it were found grossly negligent, its liability would not be contractually limited. *Id.* On the breach of contract claim, the Court found that a genuine issue of material fact existed as to whether ADT breached its contractual obligations to the insured but found that recovery was limited to $1,000 by the contract provision applying to injury resulting from performance or non-performance of contractual obligations. *Id.* at *7.

Applying a gross negligence standard, SGI contends in the instant case that Royal has not produced any evidence suggesting that Clarke's failure to notify the maintenance supervisor in response to the Point 51 alarm constitutes gross negligence, but "was, at most, a failure to measure up to the conduct of a reasonable person and, therefore, perhaps negligence." (Def.'s Mem. Law. Supp. Mot. Summ. J. at 11). SGI notes that there were no other critical alarms between 5:39 p.m. and 5:52 p.m. when the first alarm was received. *Id.* at 9 (citing Dana Alarm Records, Def.'s Mot. Summ. J., Ex. C.). One other critical alarm occurred after 5:54 p.m. after ADT responded to the fire alarm by calling the fire department. *Id.* at 10. SGI emphasizes that the 5:39 p.m. critical alarm was not a fire alarm but was a supervisory alarm, which did not require contacting the fire department. *Id.* at 11. It goes on to claim that Point 51 alarms were a common occurrence at Dana, and not once during the previous forty Point 51 alarms that had sounded in the weeks leading up to and including the day of the fire had there been a fire in the paint shop. *Id.* SGI contends that even though Clarke

did not remember putting the alarm into test mode that he must have done so, which would not require a response from Clarke or ADT. *Id.* at 11–12.

Royal asserts that Clarke's ignoring of this alarm was reckless and that SGI's attempts to explain the Point 51 alarm as a common occurrence that allegedly sounded five times on the day of the fire are similar to the defense used in *Douglas W. Randall*, where the alarm company defendant, after numerous false alarms, turned down the system's sensitivity to the point that it could not detect the entry of a person into the store. 516 F.Supp. at 1126–27. Just as the jury found the defendant grossly negligent in that case, Royal argues that it would not be unreasonable for a jury to find that SGI was grossly negligent when its employee ignored an alarm that he understood could be "very, very serious."

In its reply brief, SGI submitted further evidence regarding the Point 51 alarms that had sounded in the days and hours leading up to the 5:39 p.m. alarm on August 11, 1999 in an attempt to show that such alarms were a common occurrence and that none of the prior alarms indicated a fire. SGI also points to records showing that Mr. Clarke ordered the alarm to be placed in test mode until 10 p.m. on August 11 even though he does not recall doing so. (Def.'s Reply Br. Supp. Mot. Summ. J., Ex C at 25). However, even if the alarm were placed in test mode, SGI guards were not instructed to ignore all alarms, or specifically the Point 51 critical alarms, but would not respond if an alarm was in test mode only if specifically ordered not to do so. (Clarke Dep. at 56; Ott. Dep. at 103, Pl.'s Resp. Def.'s Mot. Summ. J., Exs. B, C).

Royal, through affidavits and depositions, has pointed to genuine issues of material fact as to whether Clarke's failure

to contact Dana personnel when the Point 51 critical alarm sounded constitutes gross negligence. SGI's Motion for Summary Judgment on Count II will be denied. Construing the limitation of liability clause, the Court concludes that if, under either a standard of care theory or a claim applying gross negligence, if SGI were to be found grossly negligent, its liability would not be limited to $50,000, and Royal has provided evidence upon which a jury could find that its damages far exceed the $75,000 jurisdictional amount in controversy.

### D. Claims Based on Breach of Contract

Royal asserts that its claim for breach of contract is not subject to the limitation of liability provision in the contract between Dana and SGI because that provision relates to injury or damage caused solely by the negligence of SGI. Royal asserts that the provision is unambiguous and must be given its plain meaning, but that if the Court finds the language ambiguous, that becomes a question of fact for the jury. (Pl.'s Resp. Def.'s Mot. Summ. J. at 14 n. 4).

Under Pennsylvania law, courts "have routinely referred to the specific language of the contract in issue to determine the scope of an exculpatory/limitation of liability clause, and therefore, the type of conduct for which liability was excluded or limited." *Neuchatel*, 1998 WL 966080, at *9.

In *Neuchatel*, for example, the contracts at issue in that case clearly limited the defendants' liability for breach of contract by specifically referring to the defendant's duties according to their respective contracts. In the instant case, the limitation of liability provision makes no reference to liability for performance or non-performance under the contract, but only limits liability for damages "caused solely by the negligence" of SGI or its employees. (Agreement, Def.'s Mot. Summ. J., Ex. 1).

A cause of action for breach of contract is distinct from a cause of action for negligence. In Pennsylvania, "a contract action may not be converted into a tort simply by alleging that the conduct in question was done wantonly." *Phico Ins. Co. v. Presbyterian Medical Serv. Corp.*, 444 Pa.Super. 221, 663 A.2d 753, 757 (1995). Royal maintains that the breach of contract count of its Complaint is based on SGI's failure to perform duties owed to Dana under the Agreement and is distinct from its negligence cause of action, which is based on duties SGI owes Dana "as a matter of social policy." (Pl.'s Resp. Def.'s Mot. Summ. J. at 16).

Plaintiff points to *Newark*, in which the Court recognized a cause of action for both breach of contract and negligence and found that the plaintiff raised a genuine issue of material fact on both actions. 1997 WL 539752, at *5-7.

Defendant relies on *Valhal*, in which the Third Circuit considered whether a cause of action, although arising out of a contractual relationship, should be brought in contract or tort. 44 F.3d at 208. In *Valhal*, the Court discussed two lines of reasoning: the "misfeasance/nonfeasance" approach and the "gist of the action" approach. *Id.*

The first line comes from the Pennsylvania Superior Court's opinion in *Raab v. Keystone Ins. Co.*, 271 Pa.Super. 185, 412 A.2d 638 (1979), which involved a claim that the insurance company negligently failed to pay benefits under a no-fault automobile insurance policy and that an agent of the company maliciously interfered with the contractual relationship between the policyholder and the carrier. The court wrote:

> Generally when the breach of a contractual relationship is expressed in terms of tortious conduct, the cause of

action is properly brought in assumpsit and not in trespass. However, there are circumstances out of which a breach of contract may give rise to an actionable tort. The test used to determine if there exists a cause of action in tort growing out of a breach of contract is whether there was an improper performance of a contractual obligation (misfeasance) rather than a mere failure to perform (nonfeasance). *Id.* at 187–88, 412 A.2d 638. Under the *Raab* line of reasoning, if there had been a complete failure to perform a contract, the action lies in assumpsit, while if there had been an improper performance, the action lies in tort. *See also Hirsch v. Mount Carmel Dist. Indus. Fund, Inc.*, 363 Pa.Super. 433, 526 A.2d 422, 423 n. 2 (1987). Under the second line, the misfeasance/nonfeasance distinction is not pursued.[3] Rather, the nature of the wrong ascribed to the defendant "[is] the gist of the action, the contract being collateral." *Grode v. Mutual Fire, Marine, and Inland Ins. Company*, 154 Pa.Cmwlth. 366, 623 A.2d 933, 935 n. 3 (1993) (quoting *Closed Circuit Corp. v. Jerrold Elec.*, 426 F.Supp. 361, 364 (E.D.Pa.1977)). Thus, if the harm suffered by the plaintiff would traditionally be characterized as a tort, then the action sounds in tort and not in contract. *Id.*

 However, *Valhal* is unavailing to Defendant. The Pennsylvania Superior Court has explained that "the important difference between contract and tort actions is the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus." *Phico*, 663 A.2d at 757 (cited in *Factory Mkt., Inc. v. Schuller Int'l., Inc.*, 987

F.Supp. 387, 393 (E.D.Pa.1997)). In the instant case, a genuine issue of material fact exists on all three counts of Plaintiff's Complaint as to whether Defendant's conduct constituted negligence, gross negligence, or breach of contract. The claim for breach of contract arises out of SGI's alleged failure to perform duties owed to Dana under the Agreement, and the negligence cause of action may be based on those duties as well as duties SGI may owe Dana as a matter of social policy. Here, the contract provision between Dana and SGI does not limit liability for breach of contract, and Royal has offered evidence that its damages exceed $75,000. Therefore, Defendant's Motion for Summary Judgment on Count III will be denied.

## IV. *Conclusion*

Royal has raised genuine issues of material fact for trial. Therefore, for the reasons discussed above, Defendant's Motion for Summary Judgment will be denied.

An appropriate Order follows.

### ORDER

AND NOW, this 4th day of April, 2003, in consideration of Defendant's Motion for Summary Judgment (Doc. No. 18), Plaintiff's opposition thereto, and Defendant's Reply, and following oral argument, it is hereby ORDERED that

Defendant's Motion for Summary Judgment is DENIED.

---

**3.** Subsequent cases follow the "gist of the action" approach. *See Factory Mkt., Inc. v.* *Schuller Int'l., Inc.*, 987 F.Supp. 387, 393–94 (E.D.Pa.1997).