**LEPRINO FOODS COMPANY**
Plaintiff

v.

**GRESS POULTRY, INC. Individually and t/b/a Gress Refrigerated Services, and Gress Refrigerated Services Defendants**

No. 3:CV–02–1073.

United States District Court,
M.D. Pennsylvania.

Aug. 1, 2005.

James R. Carroll, Carroll & Carroll, Sayre, PA, Michael A. Pope, Chicago, IL, for Plaintiff.

Jean M. Gardner, Schindel, Farman & Lipsius LLP, New York City, John R. O'Brien, Joseph A. O'Brien, Oliver Price & Rhodes, Clarks Summit, PA, for Defendants.

## MEMORANDUM

VANASKIE, Chief Judge.

This action seeks recovery of the value of more than eight million pounds of mozzarella allegedly spoiled with an off-odor and off-flavor while stored at a warehouse operated by Defendant Gress Refrigerated Services. Asserting that Gress Refrigerated Services was a partnership, Plaintiff Leprino Foods Company named as Defendants the purported partners—Glenn Gress, Keith Gress, James Gress, Sr. and James Gress, Jr.—along with Gress Poultry, Inc., "individually and t/b/a Gress Refrigerated Services."[1] Defendants have moved for summary judgment, contending that Leprino cannot present sufficient evidence to warrant submission of its negligence claim to a jury. In the alternative, Defendants claim that, as a matter of law, any liability in this case is restricted by a limitation of liability provision set forth on warehouse receipts issued to Leprino after each shipment of cheese was delivered to the Gress warehouse. Because there exist genuine disputes of facts material to both the question of negligence and the enforceability of the limitation of liability provision, Defendants' summary judgment motion will be denied.

## I. BACKGROUND

### A. The Parties

Leprino is a Colorado corporation with its principal place of business located in Denver, Colorado. (Defs' Statement of Material Facts ("SMF") ¶ 1, Dkt. Entry

---

1. By Memorandum and Order entered in this matter on July 25, 2005, summary judgment was entered in favor of the individual Gress Defendants because Leprino could not present sufficient evidence to show that the refrigerated warehouse business was operated in the form of a partnership by the individual Gress Defendants. Instead, the evidence showed that the refrigerated warehouse business was operated by a corporate entity that was referred to by the fictitious names, "Gress Public Refrigerated Services" and "Gress Refrigerated Services." For sake of convenience and simplicity, the remaining defendants to this litigation, Gress Poultry, Inc. and Gress Refrigerated Services, shall be referred to collectively as either "Defendants" or "Gress."

63.)[2] Leprino is the world's largest producer of mozzarella cheese. (Olsen Aff. ¶ 2, Ex. A, Dkt. Entry 70.) Leprino sells cheese to customers throughout the country, including its largest customer, Pizza Hut. (*Id.*)

Defendant Gress Poultry, Inc. is a Pennsylvania corporation with its principal place of business located in Scranton, Pennsylvania. (Defs' SMF ¶ 2.) Gress Poultry was incorporated in 1976. (Ex. 23 at 5, Dkt. Entry 61.) Gress Public Refrigerated Services is a fictitious name registered in the Commonwealth of Pennsylvania in 1985 for Gress Frozen Foods, Inc., a Pennsylvania corporation. (Defs' SMF ¶ 4.) The Gress corporate entities also conducted business under the name, "Gress Refrigerated Services." (*Id.*) Gress operates a refrigerated warehouse business in Scranton, Pennsylvania.

*B. The Bailment*

To have a constant, adequate supply of cheese for its customers in all parts of the United States, Leprino stores vast quantities of cheese in cold storage warehouses located throughout the country. (Olsen Aff. ¶ 3, Ex. A, Dkt. Entry 70.) Leprino's first contact with Gress occurred in the late 1980s when a Gress account representative, Rich Charles, met with an employee of Leprino, Phil Gates, to advise Mr. Gates that Gress had a storage facility available in Scranton, Pennsylvania. (Gates Dep. at 37–38, Ex. 26, Dkt. Entry 65.) By letter dated January 11, 1988, Mr. Charles stated as follows:

Dear Phil:

I was pleased to hear that Leprino Foods is interested in refrigerated warehousing. Gress Frozen Foods operates a public warehouse within two hours of your facility in Waverly, New York.

. . . In response to our conversation, I am pleased to quote the following rates for refrigerated storage . . . .

Enclosed are documents varifying [sic] our inspection, extermination, security, and insurance. Our insurance information is explained in our tariff pamphlet at some length. However, briefly, we are insured as a member of the I.A.R.W. (Independent Association of Refrigerated Warehouses).

The enclosed tariff referred to in the January 11th letter states, *inter alia,* that "insurance will be provided at [the] request of the storer at 4 [cents] per $100.00 declared value per month." (*Id.* at 5149.) Paragraph number 3 of the tariff contains a limitation of liability provision. Although the copy provided to the court is largely unclear, the tariff appears to state:

Limited Liability-

. . . for losses other than breakage, misdelivery, or unexplained shortage, the value of the goods stored shall be conclusively presumed not to exceed 50 cents per pound, unless the person to whom the warehouse receipt is issued declares where such goods are offered for storage, that it is of greater value and such greater value is noted on the warehouse receipt by the warehouseman, in which case the value shall be conclusively presumed not to exceed that so declared.

(*Id.*) The enclosed tariff had an effective date of March 1, 1986. The discussions between Charles and Gates did not culminate in a business relationship.

In early January, 1992, Leprino's Director of Product Management, Bob Ek-

---

**2.** Citation to Defendants' statement of material facts signifies that the parties do not dispute that particular fact.

strom, engaged in business discussions with Glenn Gress about storing Leprino's cheese at the Gress warehouse. (Ekstrom Aff. ¶ 2, Ex. B, Dkt. Entry 72.) As the Director of Corporate Materials, Mr. Ekstrom was responsible for negotiating agreements on Leprino's behalf with food storage warehouses, and was familiar with the ordinary practices and customs in the food storage warehouse industry. (*Id.* ¶¶ 2, 3.) By letter dated January 15, 1992, Glenn Gress expressed an interest in doing business with Leprino and discussed the size of the Gress warehouse freezer, storage rates, and transportation services. (Dkt. Entry 85 at 989.)

On February 4, 1992, Mr. Charles wrote to Mr. Gates and Don Kleck to quote handling and storage rates. (Defs' Ex. 19, Dkt. Entry 61.) On February 11, 1992, Mr. Ekstrom sent a letter to Mr. Charles summarizing the relevant terms of the business relationship between Leprino and Gress Public Refrigerated Services. (Defs' Ex. 20, Dkt. Entry 61.) The letter stated in relevant part:

Dear Rich:

This letter will outline the key items involved in storing our frozen product in your facility. This does not cover everything in detail as standard warehousing procedures are assumed to be followed as well:

1. You will primarily be storing two products for us which will be truck shipped in a frozen state and stored by you at 0 [degrees] F. or less.

. . . . .

3. When unloading the trucks, please keep a record of any damages to any cases both as to the type of damage (e.g., crushed cases, wet cases).... No damaged cases are to be shipped to our customer but rather set aside and the quantities notified to us, from which we will advise disposition. Damaged cases

are defined as those that are not in their original condition and cannot stack straight (e.g., crushed), are punctured (e.g., forklift damage), or have dirt or stains (e.g., water) on them. It is essential that our customers receive consistent, quality packages and pallet loads.

. . . . .

6. The products must be stored in racks at all times.

7. Please send a detailed inventory printout monthly.

8. Storage rates are $.40/cwt and handling rates are $.45/cwt.

Please feel free to contact me if you have any questions regarding the above or anything that I may have omitted. We are looking forward to doing business with your company and hope this is the beginning of a long-term relationship.

(Ex. E., Dkt. Entry 72.)

After Mr. Ekstrom sent the letter to Mr. Charles on February 11, 1992, Leprino began storing cheese at the Gress warehouse. (Ekstrom Aff. ¶ 7, Ex. B, Dkt. Entry 72.) From time to time, Gress and Leprino modified the terms of their agreement set forth in the February 11, 1992 letter by changing the storage rates, handling rates, and the people authorized to release product. (*Id.*) There were also periods of time between 1992 and November of 2001 when Leprino did not have any product stored in the Gress warehouse. (Defs' SMF ¶¶ 22–23.)

*C. The Limitation of Liability Provision*

It appears undisputed that Gress issued nonnegotiable warehouse receipts to Leprino for each lot shipment. (Defs' Br. in Supp. of Mot. for Summ. J. at 6, Dkt.

Entry 68.) The front of the receipt provides:

> The above described merchandise... [is] subject to... all the terms and conditions contained herein and on the reverse hereof. Subject also to all Special Tariff Provisions on our tariff. Liability for loss or damage shall be limited to the actual value of the goods stored; and in no case shall the liability exceed 20 [cents]/lb. unless an excess value is declared by the storer at the time the goods are stored.

(Defs' Ex. 8.) Paragraph 3 on the back of the receipt provides:

> 3. Limited Liability—For the purpose of fixing storage rates and the maximum limit of the warehouseman's liability for losses other than breakage, misdelivery or unexplained shortage, the value of goods stored shall be conclusively presumed not to exceed 20 cents per pound; unless the person to whom the warehouse receipt is issuable declares, when such goods are offered for storage, that it is of greater value and such greater value is noted on the warehouse receipt by the warehouseman, in which case the value shall be conclusively presumed not to exceed that so declared. Except as otherwise provided, the specified tariff storage rates are minimum rates which apply where no value is so declared and noted, or where, if declared, it does not exceed the otherwise presumed limit, and where such declared value exceeds such otherwise presumed limit, an additional rate will be added and charge equivalent to 10% of the amount of such excess for each month [or] part thereof. The warehouseman's liability for losses other than breakage, misdelivery or unexplained shortage, is limited to and shall in no event exceed whichever is smallest of the bailor's cost, replacement value, or as the case may be, such presumed value of 20 cents per pound or declared limit of value in respect of which the storage rate is so fixed and payable.

(Defs' Ex. 8 ¶ 3.)

Leprino maintains that it was unaware of this limitation of liability provision at the time that Mr. Ekstrom confirmed the terms of the parties' engagement in his February 11, 1992 letter. Leprino further maintains that it would not have entered into the bailment arrangement with Gress had it been aware of this limitation of liability. Gress, while disputing the assertion that Leprino was unaware of the limitation of liability provision before February 11, 1992, argues that the limitation of liability falls within the phrase "standard warehousing procedures" as used in the February 11, 1992 letter.

According to Mr. Ekstrom, "standard warehousing procedures" include "measures relating to pest control, sanitation, general housekeeping, good manufacturing practices, building and equipment maintenance, and loading, handling, and shipping of product." (Ekstrom Aff. ¶ 6, Ex. B, Dkt. Entry 72.) Mr. Ekstrom asserts that standard warehousing procedures do not include a warehouse's invoicing procedures, warehouse receipts, or any limitations of liability imposed by the warehouse. (*Id.*) During Glenn Gress's deposition, he testified that standard warehouse procedures include invoicing. (Glenn Gress Dep. at 27, Ex. D, Dkt. Entry 72.) He further testified that he and Mr. Ekstrom discussed the terms and conditions on the standard warehousing receipt when they first met. (*Id.* at 30.)

It does appear that Leprino was aware of the limitation of liability provision in the Gress warehouse receipt prior to the incidents of 2001 that give rise to this litigation. In this regard, in the late 1990s, Leprino's Vice President of Procurement

and Logistics, Mr. Hegarty, looked through Leprino's files to determine whether Leprino had adequate insurance coverage for the inventory in storage. As part of this review, Mr. Hegarty reviewed Gress's nonnegotiable receipt. (Hegarty Dep. at 39–40, Ex. G, Dkt. Entry 72.) There is no evidence that Leprino objected to the limitation of liability at that time.

It also appears, however, that Gress did not enforce the limitation of liability provision in the one incident of alleged damage to Leprino's product that preceded the present claim. In 1999, Leprino submitted an invoice to Gress for 1,935 pounds of cheese Gress allegedly had damaged. (Glenn Gress Dep. at 35–40, Ex. D, Dkt. Entry 72.) The invoice sought $3,207, which reflected the full value of the cheese at $1.6575 per pound. (*Id.* at 37.) Gress paid Leprino the full amount. (*Id.* at 36–37.)

### D. The Contamination of the Cheese

After Leprino began storing its cheese at the Gress facility, a Leprino quality control auditor, Scott Hall, performed two formal inspections and one informal inspection of the Gress facility. (Hall Dep. at 11–12, Ex. 28, Dkt. Entry 65.) On February 27, 2001, Hall filled out an audit for Pizza Hut that required him to determine, *inter alia*, whether the product cases were clean and free from damage, whether only food products were stored above and next to Leprino food products, and whether there were any strong odors in the storage area. (*Id.* at 13; Ex. H at 6, Dkt. Entry 72.) At the time of his audit, the freezers were empty and there were no strong odors in the storage area. (Ex. H at 6; Hall Dep. at 60, Ex. I, Dkt. Entry 72.) The report noted, "[t]here are no activities or conditions observed that could potentially contaminate or adulterate the product." (Ex. H. at 5.) The front page of

the audit report provides a score for the facility and a section for comments on what the facility can improve on. Mr. Hall noted that the Gress warehouse needs, *inter alia*, a written pest control program. The bottom of the first page provides for the auditor's signature and the facility manager's signature. Neither the auditor nor facility manager signed the audit. (*Id.* at 1.)

In March 2001, Leprino began shipping cheese to Gress for storage after a period of zero inventory. By September, 2001, Leprino had over eight million pounds of cheese stored at the Gress warehouse. (Olsen Aff. ¶ 5, Ex. T, Dkt. Entry 72.) For each shipment of cheese, Gress employees signed bills of lading attesting to the apparent good condition of each truckload of cheese upon its arrival at the warehouse. (Ex. U, Dkt. Entry 72.) Gress employees inspected Leprino's products for obvious damage of the containers. (Charles Dep. at 40, Ex. W, Dkt. Entry 72.) Some time after inspection, Gress employees generally used a forklift to move the palletized loads of cheese from the trailer to their designated racks in the warehouse. (*Id.* at 44, Ex. 30, Dkt. Entry 65.)

In the fall of 2001, Leprino began shipping cheese stored at the Gress warehouse to Pizza Hut's distribution center in Charlotte, North Carolina. Leprino also shipped some cheese directly from Leprino's Waverly facility to Pizza Hut. (Wilken Dep. at 180, 182–83; White Dep. at 15, Ex. O, Dkt. Entry 72.) On October 1, 2001, Leprino received eight complaints of an off-odor and off-flavor in the Leprino cheese that had been distributed to Pizza Hut stores in North Carolina. (White Dep. at 10, Ex. O, Dkt. Entry 72.) By October 5, Leprino received an additional 307 complaints about the cheese shipped to Pizza Hut. (*Id.* at 12, 17.)

After receiving the first complaints, Leprino's Quality Assurance Division quickly traced all of the cheese involved in the complaints to Leprino's Waverly plant by using production plant codes Pizza Hut supplied with its complaints. (Wilkin Dep. at 166–68, Ex. J, Dkt. Entry 72.) The Quality Assurance Division also determined that all of the cheese subject to the complaints had been stored at the Gress warehouse in Scranton, Pennsylvania through Leprino's computerized "recall reports." (Id. at 175–76.) The employees at the Waverly facility also pulled production reports, composition test results, and microbiology tests for the lots of cheese that had generated complaints. (Id. at 176–79.) The records revealed that no conditions existed in the Waverly plant that could have caused the off-odor/flavor. Furthermore, Leprino did not receive any complaints about the cheese that bypassed the Gress warehouse and was shipped directly to Pizza Hut. (Wilken Dep. at 180, 182–83; White Dep. at 15, Ex. O, Dkt. Entry 72.)

Because Leprino had trucked its cheese from its Waverly plant to Gress, Leprino also looked at trailer inspections at the Waverly plant, the temperatures of the product leaving the plant, and the settings on the refrigeration units in the trucks. (Defs' SMF ¶ 40; Wilkin Dep. at 239, Ex. J., Dkt. Entry 72.) The record is unclear as to the results of the trailer and truck inspections. (Id. at 239.)

On October 1, 2001, Leprino's Quality Control personnel in both Denver, Colorado and at the Waverly plant tested "retention samples" from the production dates that triggered Pizza Hut's complaints.[3] None of the retention samples corresponding to the cheese stored at the Gress warehouse exhibited an off-odor/flavor. (Wilken Dep. at 175–78, Ex. J, Dkt. Entry 72.)

Ms. Wilkin searched Leprino's records for any other recent complaints of an off-odor/flavor in its cheese. (Id. at 236–37.) In 2001, Leprino had stored a single shipment of cheese produced at its Roswell, New Mexico facility at the Gress warehouse. (Hegarty Dep. at 143, Ex. G, Dkt. Entry 72.) Around September 20, 2001, Leprino's quality assurance group received a complaint from Papa John's of an off-odor/flavor as to that shipment of cheese. (Id.; Wilken Dep. at 236, Ex. J, Dkt. Entry 72.) Leprino investigated the complaint but was unable to determine the cause of the off-odor/flavor because it could not get a sample of the damaged cheese. (Wilken Dep. at 236–37.)

On October 2, 2001 three Leprino executives visited the Gress warehouse and several of the Pizza Hut stores that had complained about the cheese. The three executives were Rick Barz, the Senior

3. Leprino takes samples of cheese from the end of the Waverly production line every two hours and stores the samples at the Waverly facility to establish the baseline condition of the product for some of its customers. (Hall Dep. at 45–46, Ex. I, Dkt. Entry 72.) For its customer Pizza Hut, Leprino keeps up to ten samples of cheese a day, weighing five pounds each. (Id. at 46.) The Waverly retention samples and final product are stored in different types of bags made by different manufacturers. (Id. at 46–47.) The retention samples are in sealed bags and the final product for shipment is not in a sealed bag. (Wilkin Dep. at 90, Ex. J, Dkt. Entry 72.) The retention samples and final product are also put in boxes made by two separate manufacturers that have different assembly requirements and configurations. (Hall Dep. at 46–47, Ex. 28, Dkt. Entry 65.) The quality assurance standards do not include a chemical analysis of packaging materials such as the stretch wrap, bags, boxes, or tape. (Id. at 43–45.) During the deposition of Edith Wilken, Leprino's Vice President of Quality Assurance, she testified that there is "no significant difference" between the retention samples and the final product. (Wilkin Dep. at 90–91, 93, Ex. J, Dkt. Entry 72.)

Vice President of Quality Assurance and Research and Development, George Wittenberg, the Technical Manager of Materials Management, and Ms. Wilken. (Wilken Dep. at 173.) The Leprino executives were met at the Gress warehouse by Mark White, Pizza Hut's Manager of Quality Assurance for cheese and meats. (*Id.* at 215–16.)

While visiting the Gress warehouse, the Leprino executives and Mr. White noticed a "strong," "fruity" and "sweet" odor. (Wilken Dep. at 217, Ex. J; White Dep. at 22–23, Ex. O; Barz Dep. at 88–89, Ex. K, Dkt. Entry 72.) Ms. Wilken saw "spills of liquids" that had not been cleaned up. She also saw popsicles and meat items that had come out of their containers. (Wilken Dep. at 263–66.) Some of the spilled meat items were placed directly on top of the cheese pallets. (*Id.* at 265.)

Mr. Wittenberg walked each aisle of the warehouse where Leprino's cheese was stored. (Wittenberg Aff. ¶ 6, Ex. Y, Dkt. Entry 72.) He observed many opened and damaged cases of various products, including: (1) frozen wrapped turkeys that were out of the case and on top of the cheese; (2) a twenty pound bag of battered chicken pieces scattered on top of the cheese; (3) a broken case of lemonade cups, some sour cream, and icees on top of the cheese; and (4) pallets of cheese that had pieces of broken pallets on top. (*Id.* ¶ 7.) Mr. Wittenberg also saw several drums of Hi C orange concentrate in an aisle where cheese was stored. One of the drums had a loose lid that was full of spilled liquid syrup. The spilled liquid syrup did not appear frozen. (*Id.* ¶ 8.) In addition, Mr. Wittenberg observed smashed products, icees and dough products that were forced between the uprights of racking. There were also smashed icees and cups of lemonade on the floor that had been rolled over by forklifts. (*Id.*)

On October 3, 2001, Mr. White, Mr. Barz, and Ms. Wilkin went to a Pizza Hut store in North Carolina to test some of the damaged cheese on a cooked pizza. They all concluded that the cheese exhibited a strong, sweet, fruity odor/taste that was completely unacceptable. (Wilkin Dep. at 160, Ex. J; White Dep. at 23, Ex. 0; Barz Dep. at 90–93, Ex. K, Dkt. Entry 72.) During Mr. White's deposition, he testified that the cheese seemed to have absorbed the sweet, fruity smell of the Italian Ices stored at the Gress warehouse. (White Dep. at 53, Dkt. Entry 72.)

Leprino trucked portions of the damaged cheese from the Gress warehouse to another cold storage warehouse operated by Millard Refrigerated Services in Allentown, Pennsylvania. When an employee for Millard, Richard Lynch, opened the trucks, he noticed a strong and obvious sweet, fruity odor coming from the pallets of cheese. (Lynch Dep. at 52, Ex. Z, Dkt. Entry 72.) Mr. Lynch testified that the odor of the cheese reminded him of "ice pops." (*Id.*) The smell was "very sweet— like an ice cream or Italian ice type smell." (*Id.*) The odor was so strong that Mr. Lynch decided to segregate the cheese in the warehouse. (*Id.*)

Leprino had its Director of Research and Development, Richard Merrill, test samples of cheese that were stored in the Gress Warehouse and the retention samples. (Ex. L ¶¶ 1–2, 5, Dkt. Entry 72.) He took samples from each of the 57 production dates stored at Gress and conducted an "organoleptic" analysis, involving blind taste test panels. (*Id.* ¶ 3.) The blind taste tests revealed that the cheese stored at Gress exhibited off-odors/flavors to varying degrees, whereas the retention samples revealed no problems. (*Id.* ¶ 4.) Dr. Merrill also sent samples for bacteriological testing. (*Id.* ¶ 7.) The results of those tests revealed no bacteria capable of

producing the off-odor detected in cheese. (*Id.*)

Dr. Merrill also sent the retention samples and the cheese stored at Gress for chemical analysis. The analysis determined that the samples stored at Gress contained the chemicals limonene, xylene, toluene, and alpha-pinene. (*Id.* ¶ 5.) These four chemicals are used in industrial solvents. (*Id.*) Although Dr. Merrill could not identify the exact source for these chemicals at the Gress facility, the chemicals were also present within air samples taken from the Gress facility. (*Id.* ¶ 8.) Several other compounds with a "fruity, paint-like aroma" existed in the samples stored at the Gress warehouse. (*Id.* ¶ 6.) The samples retained from the Waverly production plant had a chemical make-up that would be expected of cheese, and did not contain the same chemicals and compounds found in the Gress samples. (*Id.* ¶¶ 5, 6.)

Dr. Merrill opines to a reasonable degree of scientific certainty that the limonene, alpha-pinene, xylene or toluene are the cause of the off-flavor/aroma present in the cheese that was stored in the Gress warehouse. (*Id.* ¶ 8.) Dr. Merrill further opines to a reasonable degree of scientific certainty that the chemicals were not present when the cheese was manufactured or when it was temporarily stored at the Waverly plant. (*Id.*) He further opines that the damaged cheese that remained at the Gress warehouse was not fit for human consumption. (*Id.* ¶ 9.)

On March 25, 2003, Dr. Michael Qian, an expert flavor chemist, examined two damaged samples and four control samples of mozzarella cheese. (Qian Aff. ¶¶ 2, 4, Ex. R, Dkt. Entry 72.) Dr. Qian initially tested the cheese for different compounds by smelling and tasting the cheese. (*Id.* ¶ 4; Qian Report at 61.) The initial sensory analysis revealed a pineapple off-flavor.

(Qian report at 61.) Dr. Qian then analyzed the samples using a process called Gas Chromatography–Mass Spectronomy/Olfactory. (*Id.* ¶ 4; Report at 61.) He found ethyl butyrate and a lesser amount of limonene in the damaged samples of cheese. (*Id.* ¶ 4; Report at 61.)

Limonene creates a citrus, fruity, off-flavor. (Qian Report at 61.) Ethyl butyrate is a "potent" aroma compound widely present in fruits such as pineapples, bananas, and pears. (*Id.*) The compound is frequently used for artificial flavoring in many fruit-type products. (*Id.*) Ethyl butyrate can be easily dissipated into the air and then absorbed by other food products. (*Id.*) Because Leprino's cheese has a very bland aroma, absorption of ethyl butyrate would cause an obvious off-flavor to the cheese. (*Id.*)

On June 9, 2003, Dr. Qian visited the Gress warehouse. (*Id.* at 20.) He noted that the facility contained a variety of products, including meats, frozen fruit juice products, and fruit juice concentrates. (*Id.*) When Dr. Qian entered the freezer, he immediately detected a mixed fruity aroma. (*Id.*)

On June 10, 2003, Dr. Qian visited Lerpino's manufacturing facility in Waverly, New York. (*Id.*) The plant appeared clean and did not contain a fruity aroma. (*Id.*) He also investigated the manufacturing warehouse at the Waverly facility where the finished products were stored. He did not see any other food products stored in the warehouse. (*Id.*) He did not detect any odor in the warehouse. He did not find chemical solvents capable of producing the odor in the shipping area, the general storage area, and the mechanical room. (*Id.*)

In the fall of 2003, Dr. Qian conducted additional tests on about twenty additional samples of cheese from the Gress ware-

house. (Qian Aff. ¶ 6.) He also analyzed a sample of cardboard containing a spill of syrup-like material from the Gress warehouse. (*Id.*) The syrup-like material contained high levels of ethyl butyrate. (*Id.*) The cheese stored at the Gress warehouse also contained ethyl butyrate. (*Id.*) He found that the degree of damage to the cheese varied due to "storage time and other factors." (Report at 61.) He found that the retention samples did not contain ethyl butyrate. (*Id.*) Dr. Qian opined that the source of the damage was exposure to fruit based products at the Gress warehouse. (*Id.* ¶ 7.) He did not think that the cheese could have been damaged while being transported in trucks because "trucks are not likely to contain the levels of ethyl butyrate and limonene necessary to have caused the damage to the extent found." (Report at 62.)

Pizza Hut found the off-odor/flavor cheese unacceptable and rejected all 8,220,495 pounds of the mozzarella cheese stored at the Gress warehouse. (Def's SMF ¶ 7; White Dep. at 23, 25, Ex. 0, Dkt. Entry 72.) Leprino explored ways to salvage the damaged cheese and considered reprocessing the cheese and selling some of the cheese at a reduced price. (Barz Dep. at 98, Ex. K; Reidy Dep. at 61, Ex. P, Dkt. Entry 72; Hegarty Letter, Ex. 18, Dkt. Entry 65.) Leprino received an offer from Worldwide Sales & Liquidations, Inc. to buy eight million pounds of cheese for $.4025 per pound. (Ex. 19 at 9335, Dkt. Entry 65.) Leprino also received a bid from James Farrell & Company for the cheese. (Wittenberg Dep. at 208, Ex. 25, Dkt. Entry 65.) Leprino ultimately determined that it would be irresponsible to resell or reuse any of the cheese. (Reidy Dep. at 62–64, Ex. P, Dkt. Entry 72.)

Leprino has brought this action to recover the full value of the more than 8 million pounds of mozzarella rejected by Pizza Hut.[4] Briefing on Gress's summary judgment motion is complete, and oral argument was heard on August 19, 2004.

## II. DISCUSSION

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 197 (3d Cir.), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Initially, the moving party must show the absence of a genuine issue concerning any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *See Continental Ins. Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.

---

4. Leprino has also asserted a claim against its insurer for the adulterated cheese. The disposition of that matter is not known.

1982). Once the moving party has satisfied its burden, the nonmoving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257, 106 S.Ct. 2505. Mere conclusory allegations or denials taken from the pleadings are insufficient to withstand a motion for summary judgment once the moving party has presented evidentiary materials. *See Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rule 56 requires the entry of summary judgment if there was adequate time for discovery and a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

The parties seem to agree that Pennsylvania law controls the substantive issues presented here. This Court's task, of course, is to determine how the Pennsylvania Supreme Court would decide these issues. *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 459 (3d Cir.1993).

## A. The Negligence Claim

Under Pennsylvania law, "[a] bailment is a delivery of personalty for the accomplishment of some purpose upon a contract, express or implied, that after the purpose has been fulfilled, it shall be redelivered to the person who delivered it, otherwise dealt with according to [the bailor's] directions or kept until [the bailor] reclaims it." *Price v. Brown*, 545 Pa. 216, 680 A.2d 1149, 1151–52 (1996); *accord Smalich v. Westfall*, 440 Pa. 409, 269 A.2d 476, 480 (1970); *American Enka Co. v. Wicaco Mach. Corp.*, 686 F.2d 1050, 1053 (3d Cir.1982). "Where chattels are delivered to [a] bailee in good condition and are returned in a damaged state, ... the law presumes negligence to be the cause, and

casts upon the bailee the burden of showing that the loss is due to other causes consistent with due care on his part .... In order to [shift] the burden of evidence upon the bailee, it is sufficient that the bailor has shown damage to the bailed article that ordinarily does not happen where the requisite degree of care is exercised." *Crowley v. Serv. Garage*, 8 Pa. D. & C. 559, 561 (Pa.Com.Pl.1927); *accord E.I. Dupont De Nemours & Co. v. Berm Studios, Inc.*, 211 Pa.Super. 352, 236 A.2d 555, 557 (1967). Thus, "[a]lthough the bailor-bailee relationship has its origins in contract, liability is based on the tort concept of negligence." *American Enka Co.*, 686 F.2d at 1053.

"Negligence is the doing of that which a reasonably prudent man would not do under the circumstances, or the failing to do that which a reasonably prudent man would do under the circumstances. The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm resulting from his act." *Aquadro v. Crandall–McKenzie & Henderson, Inc.*, 182 Pa.Super. 435, 128 A.2d 147, 149 (1956). "What constitutes ordinary care or diligence varies with the circumstances under which the bailment is made, the nature of the subject matter, the business in which the bailee is engaged, and the usages of that particular industry, and is necessarily a question for the jury." *Id.* at 149. If the bailee's failure to exercise due care proximately results in the loss of the subject of the bailment, the bailee is liable in negligence. *Dravo Mechling Corp. v. Standard Terminals, Inc.*, 557 F.Supp. 1162, 1166 (W.D.Pa. 1983).

### 1. Condition of the Cheese Upon Delivery to Gress

In the present case, Defendants first argue that Leprino cannot establish

that the cheese was delivered to the Gress warehouse in good condition. (Defs' Br. in Supp. of Mot. for Summ. J. at 9–10, Dkt. Entry 68.) Defendants essentially argue that Leprino failed to eliminate the possibility that the cheese was damaged when it was: (1) produced at the Waverly facility; (2) packaged; or (3) transported by truck to the Gress warehouse. Each argument will be addressed in turn.

a. Production of cheese at the Waverly facility

As to the production of the cheese at the Waverly facility, the record shows that after Leprino received complaints about the cheese stored at the Gress warehouse, the employees at the Waverly facility pulled production reports, composition test results, and microbiology tests for the lots of cheese that had generated complaints. The reports and test results revealed that no conditions existed in the Waverly plant that could have caused the off-odor/flavor. In addition, Leprino did not receive any complaints about the cheese produced at the Waverly plant that was shipped directly to Pizza Hut.

As a quality assurance measure, Leprino took samples of cheese from the end of the Waverly production line every two hours and stored the samples at the Waverly facility to establish the baseline condition of the manufactured product. On October 1, 2001, Leprino's Quality Control personnel in both Colorado and at the Waverly plant tested the retention samples from the production dates that triggered Pizza Hut's complaints. None of the retention samples corresponding to the cheese stored at the Gress warehouse exhibited an off-flavor.[5]

Leprino had its Director of Research and Development, Dr. Merrill, test the samples of cheese stored in the Gress warehouse and the retention samples. Dr. Merrill submitted the samples for bacteriological testing and found no bacteria capable of producing the off-odor detected in the cheese. On March 25, 2003, Dr. Merrill sent the retention samples and the cheese stored at the Gress warehouse for chemical analysis. The chemical analysis revealed that the cheese stored at the Gress warehouse contained the chemicals limonene, xylene, toluene, and alpha-pinene. The retention samples did not contain these chemicals. Although Dr. Merrill could not identify the exact source of these chemicals at the Gress warehouse, the chemicals were present within air samples taken from the Gress warehouse. Dr. Merrill opined to a reasonable degree of scientific certainty that the chemicals caused the damage to the cheese. He further opined that the chemicals present at the Gress warehouse were not present when the cheese was manufactured or when it was temporarily stored at the Waverly plant.

In the Fall of 2003, Dr. Qian conducted additional tests on about twenty additional samples of cheese from the Gress warehouse. He also analyzed a sample of cardboard containing a spill of syrup-like material from the Gress warehouse. The syrup-like material contained high levels

---

**5.** Defendants argue that the retention sample is not a reliable sample of the final product because: (1) the sample and the final product are placed in different types of bags made by different manufacturers; (2) the sample is stored in a sealed bag while the final product is not in a sealed bag; and (3) the sample and the final product are placed in different boxes made by different manufacturers. Ms. Wilken testified, however, that there is "no significant difference" between the retention samples and the final product. This testimony is sufficient to create a genuine dispute of material fact on the reliability of the retained samples.

of ethyl butyrate. The cheese stored at the Gress warehouse also contained ethyl butyrate, but the retention samples did not. Dr. Qian opined that the source of the damage was exposure to fruit-based products at the Gress warehouse.

The evidence is plainly sufficient to permit a rational conclusion that the cheese was not damaged during its production at the Waverly facility. The reports and composition tests pulled from the Waverly facility revealed that no conditions existed at the Waverly plant that could have caused the off-odor/flavor. The cheese shipped directly from Leprino's Waverly facility to Pizza Hut was not damaged. The retention samples did not exhibit the off-odor/flavor found in the samples stored at the Gress warehouse. Mr. Barz opined that the cheese had absorbed the strong, fruity smell that he and the Leprino executives noticed in the Gress warehouse in October, 2001. Moreover, Dr. Merrill and Dr. Qian opined to a reasonable degree of scientific certainty that the cheese was damaged due to conditions at the Gress warehouse. This evidence is sufficient to support a rational inference that the mozzarella was not adulterated in the production process.

b. Packaging of the cheese

As to the packaging of the cheese, the record supports an inference that the odor did not result from the packaging. During the deposition of Defendants' expert, Dr. Sawyer, the following exchange occurred:

Q. If we take a single pallet of cheese with off-odor ... and isolate it in the beginning of [its] stay at Gress and ... several months later; if the cause is either the bags or packaging, something that happened before it got to Gress, would it smell more strongly at the beginning of its stay at Gress or at the end of its ... stay at Gress?

A. Assuming that the cheese did have an odor at initiation, it would have less odor as time progressed.

Upon delivery of the cheese at the Gress warehouse, the Gress employees signed bills of lading attesting to the apparent good condition of each truckload of cheese. The Gress employees inspected Leprino's products for obvious damage to the containers. The employees did not note any obvious damage or odor on the bills of lading. After Leprino discovered that the cheese stored at the Gress warehouse was damaged, Leprino trucked portions of the damaged cheese from the Gress warehouse to another cold storage warehouse operated by Millard Refrigerated Services. When an employee for Millard, Richard Lynch, opened the trucks, he noticed a strong, obvious, sweet, and fruity odor coming from the pallets of cheese. The odor was so strong that Mr. Lynch decided to segregate the cheese in the warehouse.

Based on the record, a reasonable fact finder could infer that the odor did not originate with the packaging materials. Dr. Sawyer opined that the odor would weaken if the odor originated in the packaging materials or cheese. A jury could rationally infer that the odor was stronger as time progressed because the Gress employees did not note a strong odor on the bill of lading when the cheese first arrived at the Gress warehouse, yet Mr. Lynch noted a strong and obvious odor when the cheese was later shipped to the Millard warehouse. Thus, a reasonable fact finder could infer that the odor did not originate with the packaging materials or with the initial cheese product.

c. Transportation

As to the transportation of the cheese to the Gress warehouse, the record contains Dr. Qian's opinion that the cheese was not damaged while it was transported in the

trucks. Dr. Qian found that the degree of damage to the cheese varied due to "storage time and other factors." In general, the less time the cheese was kept in the Gress warehouse, the lesser the extent of damage. Dr. Qian did not think that the cheese was damaged in the trucks because "trucks are not likely to contain the levels of ethyl butyrate and limonene necessary to have caused the damage to the extent found." Dr. Qian further opined that even if one or several truck loads of cheese were damaged in transit, the damaged cheese would not have contained a sufficient level of ethyl butyrate and limonene to cause the extent of damage found in all of the samples taken at the Gress warehouse. Based on Dr. Qian's tests and opinions, a reasonable jury could find that the cheese was not damaged while it was being transported.

In summary, the record contains sufficient evidence demonstrating that the cheese was in good condition when it was manufactured at the Waverly facility, packaged, and then transported by truck to the Gress warehouse. The burden thus shifts to Gress to show that it exercised due care in its storage and product handling practices.

### 2. Gress's Negligence

Gress argues that it was not negligent in the handling and storage of Leprino's cheese because Leprino did not give any special handling instructions with the cheese. (Defs' Br. in Supp. of Mot. for Summ. J. at 11, Dkt. Entry 68.) Mr. Ekstrom testified during his deposition that he did not think that Leprino specified whether the product should be stored with edible or inedible product. Mr. Wittenberg also testified that Leprino did not have a requirement that its cheese be isolated from other product. The record, however, shows that Gress was aware through its dealings with other customers that products can pick up off-odors in cold storage from exposure to strong smelling items. In fact, Gress tried to keep seafood products away from Leprino products because of the seafood's strong odor. Furthermore, the question of ordinary care of a warehouse operator storing cheese is plainly an issue for the factfinder.

In this case, Leprino has presented evidence suggesting a lack of ordinary care at the Gress warehouse. After Leprino received complaints about the cheese, the Leprino executives and Mr. White visited the Gress warehouse and noticed a strong "fruity" and "sweet" odor. Ms. Wilken saw "spills of liquids" that had not been cleaned up. She also saw popsicles and meat items that had come out of their containers. Some of the spilled meat items were placed directly on top of the cheese pallets.

Mr. Wittenberg walked each aisle of the warehouse where Leprino's cheese was stored. He observed many opened and damaged cases of various products, including: (1) frozen wrapped turkeys that were out of the case and on top of the cheese; (2) a twenty pound bag of battered chicken pieces scattered on top of the cheese; (3) a broken case of lemonade cups, some sour cream, and icees on top of the cheese; and (4) pallets of cheese that had pieces of broken pallets on top. Mr. Wittenberg also saw several drums of Hi C orange concentrate near the middle of the aisle where the cheese was stored. One of the drums had a loose lid that was full of spilled liquid syrup that did not appear frozen. In addition, Mr. Wittenberg observed smashed products, icees and dough products that were forced between the uprights of racking. There were also smashed icees and cups of lemonade on the

floor that had been rolled over by fork-lifts.[6]

On October 3, 2001, Mr. White, Mr. Barz, and Ms. Wilkin went to a Pizza Hut store in North Carolina to test some of the damaged cheese on a cooked pizza. They all concluded that the cheese exhibited a strong, sweet, fruity odor/taste that was completely unacceptable. During Mr. White's deposition, he testified that the cheese seemed to have absorbed the sweet fruity smell of the Italian Ices stored at the Gress warehouse.

On June 9th, 2003, Dr. Qian visited the Gress Warehouse in Scranton, Pennsylvania. The facility contained a variety of products, including meats, frozen fruit-juice products, and fruit juice concentrates. When Dr. Qian entered the freezer, he immediately detected a mixed fruity aroma. Dr. Qian opined that the source of the damage was exposure to fruit-based products at the Gress warehouse.

In summary, the record supports a finding that Gress knew or should have known that Leprino's cheese should be stored away from strong smelling products. The record also shows that numerous fruit products were spilled near the Leprino cheese and several witnesses testified about the strong, fruity odor throughout the storage area where the Leprino cheese

was located. A jury could rationally find that the exposure to such spills and odors was the result of carelessness, and that this negligence was the proximate cause of the damage done to the cheese. As a result, summary judgment will be denied as to Leprino's negligence claim.[7]

### B. Limitation of Liability

Defendants next argue that any potential damage claims in this action should be limited by the terms of the nonnegotiable receipt limiting liability to $.20/lb.[8] Leprino asserts that the limitation of liability provision was not one of the essential terms of the parties' agreement memorialized in Mr. Ekstrom's February 11, 1992 agreement. Leprino further asserts that Gress could not sua sponte insert a limitation of liability term into the parties' contract after its formation without some showing of additional consideration flowing from Gress to Leprino. Gress rejoins by claiming that the February 11, 1992 letter did not establish a contractual relationship. Gress argues alternatively that if the letter did establish a contractual relationship, its warehouse receipt with its limitation of liability falls within the "standard warehousing procedures" that Mr. Ekstrom's letter incorporated into the parties' agreement. Leprino replies that even if the

---

6. Defendants argue that Mr. Wittenberg's affidavit contradicts his deposition testimony, and that his affidavit should not be considered by the court. (Defs' Reply Br. in Supp. of Mot. for Summ. J. at 11, Dkt. Entry 75.) A review of Mr. Wittenberg's deposition testimony, however, does not reveal a contradiction with his affidavit because Defendants' counsel did not ask Mr. Wittenberg to describe his observations at the Gress warehouse. Furthermore, Mr. Wittenberg's answers to counsel's questions do not purport to describe everything he observed at the Gress warehouse. As a result, Defendants' argument is without merit and consideration of Mr. Wittenberg's affidavit is appropriate.

7. Defendants also argue that they were not negligent because Leprino's auditor, Scott Hall, did not detect potential problems at the Gress facility. (Defs' Br. in Supp. of Mot. for Summ. J. at 11, Dkt. Entry 68.) It is reasonable to infer that Scott Hall's audit report did not note spilled fruit concentrate and the fruity odor because the spills and odor did not exist at the time he conducted his audit. Scott's favorable reports are, therefore, not dispositive.

8. Leprino's claim is based on a valuation of the mozzarella of approximately $1.65 per pound.

limitation of liability were enforceable here, it does not extend to gross negligence and a jury question is presented on that issue.

Gress acknowledges that "the terms of storage are controlled either by a storage contract or by the terms of the non-negotiable warehouse receipt," citing 13 PA. CONS. STAT. ANN. § 7204(b).[9] (Gress Reply Brief at 6.) Leprino claims that a storage contract was established by the Ekstrom letter of February 11, 1992, and this contract does not include any limitation of liability. Gress asserts that "[b]ecause the February 11, 1992 letter to Gress is only signed by Leprino, it cannot be found to form a contract between the two parties." (Gress Br. in Supp. of Mot. for Summ. J. at 14.)

▆▆▆ Gress's position is fundamentally unsound. Under Pennsylvania law, a contract is generally enforceable when the parties reach mutual agreement, exchange consideration, and have set forth the terms of their bargain with sufficient clarity. *See Greene v. Oliver Realty, Inc.,* 363 Pa.Super. 534, 526 A.2d 1192, 1194 (1987). A writing that is not signed by both parties may evidence a valid, binding agreement if both parties manifest their assent to its terms. *See Daniel Adams Associates, Inc. v. Rimbach Publ'g, Inc.,* 360 Pa.Super. 72, 519 A.2d 997, 1004 (1987). It is also an elementary principle of contract law that a party to a contract may not

unilaterally alter its terms. *Hosp. of Univ. of Pa. ex rel. Trustees of Univ. of Pa. v. City of Phila.,* No. 2568, 2000 WL 33711040, at *7 (Pa.Com.Pl. Nov. 15, 2000) ("A party can not simply unilaterally modify the terms of a contract and expect a court to enforce the modification without the support of an express term in the contract allowing for such unilateral modification."). Stated otherwise, a bailee may not impose a limitation of liability provision after the parties have mutually assented to the terms of the bailment. 7A ANDERSON ON THE UNIFORM COMMERCIAL CODE § 7–204:24 ("A limitation contained in a receipt which was not mailed by the bailee until after it had received the goods for storage is not effective to alter the terms of the bailment as originally made."). Thus, in *De Cecchis v. Evers,* 54 Del. 99, 174 A.2d 463 (1961), the Delaware Supreme Court refused to enforce a limitation of liability provision in a warehouse receipt issued after the parties had entered into the bailment contract.

The Pennsylvania Superior Court applied these fundamental principles of contract law in a factual context similar to that presented here in *J.W.S. Delavau, Inc. v. Eastern America Transport & Warehousing, Inc.,* 810 A.2d 672 (Pa.Super.2002). In the fall of 1991, the COO for Eastern America Transport & Warehousing ("Eastern") and the president for J.W.S. Delavau ("Delavau") entered into negotiations regarding the storage of nu-

---

**9.** Section 7204(b) provides:
(b) Contractual limitation of liability.— Damages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage, and setting forth a specific liability per article or item, or value per unit of weight beyond which the warehouseman shall not be liable; provided, however, that such liability may on written request of the bailor at the time of signing such storage agreement or within a reason-

able time after receipt of the warehouse receipt be increased on part or all of the goods thereunder, in which event increased rates may be charged based on such increased valuation, but that no such increase shall be permitted contrary to a lawful limitation of liability contained in the tariff of the warehouseman, if any. No such limitation is effective with respect to the liability of the warehouseman for conversion to his own use.

tritional supplements at Eastern's warehouse. The parties signed a letter outlining the understanding of their deal. The letter set forth the following terms and conditions: (1) the price; (2) any product Delavau requested via fax order had to be released no later than the following morning; (3) Delavau's product had to be kept in an exclusive, designated area; (4) Eastern had to provide monthly activity reports; (5) Delavau was guaranteed access to its product at all times; (6) any damage to Delavau's goods had to be reported to Delavau immediately; (7) spray pesticides could not be used near Delavau's product; and (8) storage prices were guaranteed for two years. From 1991 through 1992, Delavau transported its nutritional supplements to the warehouse. Each shipment was evidenced by a warehouse receipt that contained the pre-printed notation: "This receipt is valid only when signed by an officer of the company." Each receipt also contained certain terms and conditions, including a provision that sought to limit Eastern's liability for damages.

When Delavau sued for negligence after its nutritional supplements were damaged by water, Eastern sought to enforce the limitation of liability contained on the back of the warehouse receipt. The court found that the signed letter set out the essential terms of the agreement and that the parties had acted in conformity with that agreement until the parties' dispute arose. The court further noted that Eastern was unable to point to anything in the record to indicate that Delavau either consented to the limitation of liability contained in the warehouse receipt or that such a modification was supported by valid consideration. The court concluded that the terms of the warehouse receipt were not part of the contract between the parties. The court stated, "[i]t would demean the importance of the written agreement if the parties could find themselves bound by pre-printed terms and conditions on a warehouse receipt, especially after they had engaged in extensive negotiations and mutually agreed to terms, which did not include those contained in the warehouse receipt." *Id.* at 682.

*Delavau* is consistent with the hornbook principle that the terms of an agreement may not be altered unilaterally without mutual assent or an exchange of consideration. Leprino has tendered evidence sufficient to allow a reasonable fact finder to conclude that the parties entered into an agreement that did not include any limitation of liability. Gress has offered countervailing evidence. Jury questions on the matters of contract formation and contract terms are thus presented.

Gress insists, however, that the disputes are not material, and summary judgment is thus not precluded. It argues that, accepting as true Leprino's contention on contract formation, the parties' agreement incorporated "standard warehousing procedures," and receipts with limitations of liability fall within "standard warehousing procedures." Thus, according to Gress, its limitation of liability provision is enforceable as part of the agreement that Leprino says was formed by Mr. Ekstrom's February 11, 1992 letter.

■ " '[T]he fundamental object in interpreting a contract is to ascertain the intent of the parties.' " *Fiberlink Communications Corp. v. Digital Island, Inc.*, No. Civ. A. 01–2666, 2002 WL 1608235, at *1 (E.D.Pa. July 18, 2002) (citing *Z & L Lumber Co. of Atlasburg v. Nordquist*, 348 Pa.Super. 580, 502 A.2d 697, 699 (1985)). Determining whether a contract is ambiguous is a question of law for the court. *See Inorganic Coatings, Inc. v. Falberg*, No. Civ. A. 94–5479, 1996 WL 39472, at *5 (E.D.Pa. Feb. 1, 1996). A contract is ambiguous if it is "capable of

being understood in more senses than one; an agreement obscure in meaning through indefiniteness of expression, or having a double meaning." *Id.* A contract is not ambiguous if it is so clear that it can be read only one way. *See Landtect Corp. v. State Mut. Life Assurance Co. of Am.,* 605 F.2d 75, 80 (3d Cir.1979). Where terms of a contract are ambiguous, the parties may introduce extrinsic evidence to clarify the ambiguity. *See Inorganic Coatings, Inc.,* 1996 WL 39472 at *5. Resolution of the conflicting extrinsic evidence as to the parties' intent is a question of fact for the jury. *See id.*

■■■■ In determining whether or not there is an ambiguity, "the whole contract must be considered and not an isolated part." *Gerhart v. Henry Disston & Sons, Inc.,* 290 F.2d 778, 784 (3d Cir.1961). A court is not, however, always confined to the four corners of a document. *See Sanford Inv. Co., Inc. v. Ahlstrom Mach. Holdings, Inc.,* 198 F.3d 415, 421 (3d Cir. 1999). It may not be apparent whether a contract is ambiguous without an examination of the context in which the contract was made. *See id.* To determine the parties' intentions, the court may consider, *inter alia,* "the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Id.* The rule that ambiguities are to be construed against the drafter of the contract should be applied if all conventional means of contract interpretation, including the consideration of relevant extrinsic evidence, have left the jury unable to determine what the parties intended their contract to mean. *See 12th St. Gym, Inc. v. Gen. Star Indem. Co.,* 93 F.3d 1158, 1166 (3d Cir.1996); *Motor Coils Mfg. Co. v. Am. Ins. Co.,* 308 Pa.Super. 568, 454 A.2d 1044, 1050 (1982); 17A AM. JUR. 2D *Contracts* § 343 (2004); *see also Yocca v. Pittsburgh*

*Steelers Sports, Inc.,* 578 Pa. 479, 854 A.2d 425, 437 (2004) (noting that parol evidence is admissible to explain or clarify an ambiguous term irrespective of whether the ambiguity is created by the language of the instrument or by extrinsic or collateral circumstances).

■■■■ In the present case, the record shows that Leprino's first contact with Gress Public Refrigerated Services occurred in the late 1980s when a Gress account representative, Mr. Charles, met with an employee of Leprino, Mr. Gates, to advise him that Gress had a storage facility available in Scranton, Pennsylvania. On January 11, 1988, Mr. Charles sent a letter to Mr. Gates, quoting storage rates and discussing insurance. Mr. Charles also enclosed a tariff with a $.50/lb limitation of liability provision and a pamphlet stating that insurance will be provided at request of the bailor at 4 [cents] per $100.00 declared value per month. Leprino, however, did not begin storing cheese at the Gress warehouse at that time.

In January 1992, Mr. Ekstrom, the Leprino Director of Corporate Materials Management, spoke with Glenn Gress to discuss the possibility of storing Leprino cheese produced in its Waverly production facility. As the Director of Corporate Materials, Mr. Ekstrom was responsible for negotiating agreements on Leprino's behalf with food storage warehouses, and he claims to have been familiar with the ordinary practices and customs in the food storage warehouse industry. By letter dated February 11, 1992, Mr. Ekstrom set forth certain terms governing the storage of Leprino mozzarella specifying a storage rate of $.40/cwt and $.45/cwt at the Gress facility. Mr. Ekstrom wrote that his letter "does not cover everything in detail as *standard warehousing procedures* are assumed to be followed ...." (Ex. E, Dkt. Entry 72) (emphasis added).

Mr. Ekstrom has testified that, in his experience, "standard warehousing procedures" do not include warehouse receipts or any limitations of liability imposed by the warehouse. According to Mr. Ekstrom, he and Glenn Gress never discussed the subject of limitations of liability prior to the February 11th letter.

Glenn Gress, by way of contrast, testified that standard warehouse procedures include limitations of liability. He further testified that he and Mr. Ekstrom discussed the terms and conditions on Gress's standard warehouse receipt when they first met.[10]

There is only one prior instance of a claim by Leprino against Gress for damaged product. In 1999, Leprino submitted an invoice to Gress for 1,935 pounds of cheese that was allegedly damaged while in storage. The invoice sought $3,207, which reflected the full value of the cheese at $1.6575 per pound. Gress paid Leprino the full amount.

After reviewing the February 11, 1999 letter, I find as a matter of law that the phrase "standard warehousing procedures" is ambiguous because it is obscure in meaning within the four corners of the letter and in light of the evidence that the parties have submitted. Moreover, the parties have tendered evidence on this point that supports each side's respective position. This evidence includes: (1) the tariff Mr. Gates received from Mr. Charles in 1988 that contained a $.50/lb limitation of liability provision; (2) the conflicting testimony of Mr. Ekstrom and Glenn Gress on whether they discussed the $.20/lb limitation of liability provision; (3) the conflicting definitions of "standard warehousing procedures" by persons experienced in the industry; (4) Leprino's inaction in increasing the liability amount after Mr. Hegarty reviewed the receipt in the late 1990s; and (5) Gress's failure to enforce the limitation of liability provision in 1999 when presented with a claim for damaged product. Accordingly, summary judgment on the limitation of liability issue is not appropriate.

## C. Gross Negligence and the Limitation of Liability Provision

Leprino argues that Defendants' motion for summary judgment as to the limitation of liability provision must be denied in any event because it does not encompass damage from gross negligence.[11] (Pl's Br. in Opp'n to Defs' Mot. for Summ. J. at 16, Dkt. Entry 71.) Leprino, however, does not base its argument on the applicable statutory provision. Significantly, the limitation of liability provision in 13 Pa. Cons. Stat. Ann. § 7204(b) does not explicitly preclude a bailee from limiting its liability for gross negligence.

In support of its argument that gross negligence bars the enforcement of a limitation of liability provision, Leprino cites

---

**10.** At his deposition, Glenn Gress stated that he may not have met Mr. Ekstrom until after February 11, 1992.

**11.** Defendants argue that Leprino failed to plead gross negligence in its complaint. (Defs' Reply Br. at 4, Dkt. Entry 75.) Leprino repeatedly stated in the complaint that Defendants were "negligent, careless, and reckless." Under Pennsylvania law, gross negligence is defined as "a want of even scant care, but something less than intentional indifference to consequences of actions." *Roy-*

*al Indem. Co. v. Sec. Guards, Inc.*, 255 F.Supp.2d 497, 505 (E.D.Pa.2003). Gross negligence has also been defined as a "failure to perform a duty in reckless disregard of the consequences or with such want of care and regard for the consequences as to justify a presumption of willfulness or wantonness." *Id.* Because Plaintiffs repeatedly alleged that Defendants were negligent and reckless, Defendants had sufficient notice of a gross negligence claim.

to Kansas law applied in *Butler Manufacturing Co. v. Americold Corp.*, 835 F.Supp. 1274 (D.Kan.1993). (Pl's Br. in Opp'n to Defs' Mot. for Summ. J. at 16, Dkt. Entry 71.) In *Butler Manufacturing*, the court considered whether a limitation of liability provision was enforceable if the plaintiff's goods were destroyed through the bailee's gross negligence. The defendant argued that the limitation of liability provision for gross negligence was enforceable because the parties had equal bargaining power. After reviewing the case law in Kansas, the court determined that Kansas common law did not permit limitation of liability provisions for gross, wanton, or willful conduct because it violated public policy. *See id.* at 1282–83.

 Unlike Kansas law, however, "[t]he law of the Commonwealth does not disfavor limitation of liability provisions." *John B. Conomos, Inc. v. Sun Co., Inc.*, 831 A.2d 696, 704 (Pa.Super.2003). Thus, "such clauses are not subjected to the same stringent standards applied to exculpatory and indemnity clauses." *Valhal Corp. v. Sullivan Associates, Inc.*, 44 F.3d 195, 204 (3d Cir.1995). Accordingly, gross negligence will not bar the enforcement of a limitation of liability clause in a commercial contract if the limitation of liability clause is broad enough to cover gross negligence. *See, e.g., Royal Indem. Co. v. Sec. Guards, Inc.*, 255 F.Supp.2d 497, 503 (E.D.Pa.2003); *Neuchatel Ins. v. ADT Sec. Systems, Inc.*, No. Civ. A. No. 96–5396, 1998 WL 966080, at *6 (E.D.Pa. Nov. 5, 1998); *Hornberger v. Commonwealth Sec. Systems Corp.*, 42 Pa. D. & C. 4th 531, 537 (Pa.Com.Pl.1998).

For example, in *Neuchatel*, the plaintiff insurer brought a subrogation action against defendant ADT and others alleging that the defendants' negligence and gross negligence resulted in the burglary of a Rolex watch repair facility and the theft of $1.8 million in merchandise. The limitation of liability provision in the parties' contract stated:

> [I]f ADT should be found liable for loss, damage or injury due to a failure of service or equipment in any respect, its liability shall be limited to a sum equal to 100% of the annual service charge or $10,000, whichever is less ... and that the provisions of this paragraph shall apply if loss, damage or injury irrespective of cause or origin results directly or indirectly to person or property from performance or nonperformance of obligations imposed by this contract or from negligence, active or otherwise ....

*Id.* at *8.

 The plaintiff argued that the limitation of liability clause was not enforceable because the defendant was grossly negligent. The court stated, "that if either an exculpatory clause or a limitation of liability clause excludes or limits only negligent conduct and is not broad enough to cover conduct that may be described as grossly negligent, willful or wanton, liability is neither excluded nor limited if the conduct alleged is found to be grossly negligent, willful or wanton." *Id.* at *7 n. 4. After reading the parties' contract, the court concluded:

> The ADT and Wells Fargo contracts both contain clauses excluding, and/or placing a dollar ceiling on liability; and in both instances those clauses are keyed to negligence and conduct that is "otherwise" wrongful. Accordingly, this court concludes that, notwithstanding plaintiffs' allegations of gross negligence, plaintiffs' potential recovery from ADT and Wells Fargo is limited by those clauses.

*Id.* at *10.

The dispositive question here is whether the limitation of liability provision in the

Gress warehouse receipt can be read to cover acts of negligence and gross negligence. The provision states:

Limited Liability—*For the purpose of fixing storage rates and the maximum limit of the warehouseman's liability for losses other than breakage, misdelivery or unexplained shortage,* the value of goods stored shall be conclusively presumed not to exceed 20 cents per pound; unless the person to whom the warehouse receipt is issuable declares, when such goods are offered for storage, that it is of greater value and such greater value is noted on the warehouse receipt by the warehouseman, in which case, the value shall be conclusively presumed not to exceed that so declared.

. . . . .

*The warehouseman's liability for losses other than breakage, misdelivery or unexplained shortage,* is limited to *and shall in no event* exceed whichever is smallest of the bailor's cost, replacement value, or as the case may be, such presumed value of 20 cents per pound or declared limit of value in respect of which the storage rate is so fixed and payable.

Because the limitation applies to "liability for losses other than breakage, misdelivery, or unexplained shortage," it is sufficiently expansive to encompass gross negligence. The absence of the words "negligence" and "gross negligence" does not undermine this conclusion. *See Matthews v. Shoemaker,* Civ. A. No. 88–0705, 1988 WL 167262, at *4 (M.D.Pa. Dec. 23, 1988). The plain and ordinary meaning of the phrase "losses other than breakage, misdelivery or unexplained shortage" is that losses attributable to negligence, ordinary or gross, are subject to the express liability limits. This conclusion is reinforced by the statement that "in no event" would Gress's liability exceed the stipu-

lated limit in the absence of an agreement to the contrary. Accordingly, if a jury finds that the liability limitation was part of the parties' contract, Leprino will not be able to avoid its import by showing that Gress was grossly negligent.

### III. CONCLUSION

For the reasons set forth above, Gress's motion for summary judgment will be denied. An appropriate order follows.

### ORDER

NOW, THIS 1st DAY OF AUGUST, 2005, for the reasons set forth in the foregoing memorandum, IT IS HEREBY ORDERED THAT:

1. Defendants' motion for summary judgment (Dkt. Entry 62) is DENIED.

2. A telephonic scheduling conference will be conducted on Tuesday, August 23, 2005 at 9:30 a.m. Counsel for the plaintiff is responsible for placing the call to 570–207–5720. All parties shall be ready to proceed before the undersigned is contacted.